Filed 5/15/13  Underground Construction v. City of Oakland CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| UNDERGROUND CONSTRUCTION CO., INC., <br><br>     Plaintiff and Appellant, <br><br> v. <br><br> CITY OF OAKLAND, <br><br>     Defendant and Appellant. | A130752 <br><br> (Alameda County <br> Super. Ct. No. RG07363440) |

## I.  INTRODUCTION

Underground Construction Co., Inc. (Underground) worked on a construction project in Oakland (the Project) that included relocating existing overhead electrical, telephone, and cable television lines into conduit laid in underground trenches; removing and replacing sidewalks and adding ramps; and installing utility boxes and street light foundations.  During the course of the Project, disputes arose between Underground, the City of Oakland (the City), and the owners of the affected utility lines[1] regarding how much Underground was owed for certain aspects of the work.  Ultimately, Underground

---

    [1] The utility lines being moved belonged to Comcast of California/Colorado, LLC (Comcast); Pacific Gas and Electric (PG&E); and Pacific Telephone and Telegraph (AT&T).  AT&T was variously known during some of the relevant time periods as Pacific Telephone and Telegraph, Pacific Bell, or SBC, but for simplicity, we will refer to it simply as AT&T.  We will refer to Comcast, PG&E, and AT&T collectively as the Utilities.

sued the City and the Utilities (collectively the Owner Parties) for additional sums it alleged were due under the contract for the Project.

Underground and the Owner Parties participated in a mediation, which resulted in a settlement as between Underground and the Utilities. Underground took the position that the City had also agreed to a settlement. However, the trial court denied Underground's motion to enforce the settlement agreement against the City, and the case between Underground and the City went to jury trial.

The jury rendered a verdict in favor of Underground on most of its claims, but ruled in the City's favor on Underground's statutory claim for prompt payment. The trial court declined to reduce the amount of the verdict against the City by the amounts Underground had received from the Utilities under the settlement agreement. In postjudgment orders, the trial court denied Underground's motion for attorney fees, and granted Underground's motion to strike the City's cost bill.

The City timely appealed from the judgment. The City did not file a separate notice of appeal from the trial court's postjudgment orders, but argues that the trial court should have awarded it attorney fees. Underground appealed from the denial of its motion for attorney fees. Underground also filed a protective cross-appeal from the trial court's denial of its motion to enforce the settlement agreement against the City. We affirm the judgment, affirm the denial of Underground's postjudgment motion for attorney fees, deny the City's purported claim for attorney fees, and dismiss Underground's protective cross-appeal as moot.

## II. FACTS AND PROCEDURAL BACKGROUND

### A. The Project and the Contract

Although each of the Utilities participated in the design and planning of the Project, the City took the lead in obtaining competitive bids for the work.[2] Because the parties expected that the exact scope of the Project would require adjustment during the course of the work, the City used a unit price system to facilitate comparing bids. Under that system, the City divided the work into various categories (such as trenches and sidewalk concrete paving), and provided an estimate of the number of units of work to be done within each category (such as linear feet for trenches, or square feet for sidewalk concrete paving). The contractors bidding on the contract were required to provide a price per unit for each category of work. This enabled the City to compare bids by multiplying the price per unit times the estimated number of units, even though the City did not know the exact number of units of work that ultimately would be required (and, by the same token, the bidders did not know exactly how much they ultimately would receive).

Underground was initially the second lowest bidder, but the lowest bidder withdrew its bid, so the Project was awarded to Underground. Work on the Project was delayed for over a year after that, due to disagreements between the Utilities and the City regarding the terms of the contract for the Project.

Ultimately, Underground and the City (but not the Utilities, except for Comcast) signed a contract (the Contract), which incorporated by reference a voluminous package of contract documents, including a set of standard specifications referred to as the "Green Book" or "greenbook" (the Green Book). The Utilities that did not actually sign the

---

[2] "As is required on review after a jury trial, in reciting the facts, we 'resolv[e] . . . all conflicts in the evidence and all legitimate and reasonable inferences that may arise therefrom in favor of the jury's findings and the verdict. [Citations.]' [Citation.]" (*Bankhead v. ArvinMeritor, Inc.* (2012) 205 Cal.App.4th 68, 73.) In this section, we provide only a brief overview of basic background facts that are largely uncontroverted. Additional factual details are included in our discussion of the parties' contentions on appeal.

Contract nonetheless paid for portions of the work based on a billing formula established under the Contract.

During the course of the work on the Project and after its completion, disputes arose among the Parties regarding the amount Underground was entitled to be paid for various aspects of the work. Some of these disputes were resolved before the trial underlying this appeal. We briefly outline the remaining disputes in the next two sections.

## B. Underground's Claims for Additional Payment

### 1. Additional Sidewalk Concrete Removal

Portions of the trenches included in the Project ran underneath sidewalks, which had to be removed for construction of the trench, and then replaced. The Contract's express terms required that when a portion of sidewalk was removed and later replaced, this had to be done along the "score lines" dividing the sidewalk into "flags" (rectangles of concrete bounded by visible lines). Thus, Underground's bid contemplated that whenever the trench construction required removal of any part of a sidewalk flag, the entire flag, approximately two and one-half feet wide, would have to be removed and replaced.

As the Project progressed, the amount of sidewalk that Underground had to remove and replace on either side of the trenches turned out, in many areas, to be considerably wider than the contemplated two and one-half feet. This occurred for at least two, and possibly three reasons. First, the existing sidewalks in the area of the Project proved to be in poor condition. As a result, the City required Underground to remove and replace not only the flags situated immediately above the trenches, but also additional adjacent portions of the sidewalks. Second, the City had a rule (the six-foot rule) requiring that when the sidewalk above a section of trench was less than six feet wide, the entire sidewalk had to be removed and replaced. The six-foot rule was not referenced in the Contract, and apparently was not disclosed to Underground prior to its bid. Third, according to the City, Underground damaged portions of the existing sidewalks during the course of the work, which it was obligated under the Contract to

4

remove and replace, and removed other portions for its own convenience, which it also had to replace. As a result, Underground removed and replaced areas of sidewalk beyond the scope necessary for the Project itself. Ultimately, Underground had to remove and replace over three times the square footage of sidewalk the City had estimated the Project would include. The estimate was 40,992 square feet, but the actual work comprised 133,485 square feet.

The unit used in the Contract for the price of sidewalk concrete *paving*—that is, *replacement* of sidewalk that had been removed—was square feet. Thus, the City paid Underground for all of the sidewalk concrete paving it performed, including the additional square footage replaced due to the poor condition of the sidewalks and the six-foot rule.[3]

Under the Contract, however, the cost of *removing* sidewalk paving was included in the price for trench construction. For this category of work, the Contract used *linear feet* as the pricing unit. Accordingly, the unit price for trench construction to which Underground was entitled under the Contract was the same, no matter how wide a swath of concrete Underground was required to remove on either side of a given length of trench. For this reason, the City initially disputed Underground's claim for the additional sidewalk concrete removal—that is, the cost of *removing* additional sidewalk beyond the flags located immediately above the trenches.

Ultimately, after Underground filed a claim under the Contract's claim procedures, the City agreed that Underground should be paid $25,911 for additional sidewalk concrete removal. However, the City claimed setoffs in excess of this amount, and

---

[3] There were two other disputes between the parties regarding sidewalk concrete paving. First, the City declined to pay the portion of Underground's bills for sidewalk concrete paving that related to paving performed in connection with the installation of a utility box (utility box related paving). The dispute regarding utility box related paving is discussed *post*. Second, after the Project was complete, the City took the position that the unit price for sidewalk concrete paving should have been lower, and withheld an amount from the retention on that basis. This dispute is discussed *post* in connection with the City's setoff claims.

5

therefore did not actually pay it. This claim was included among those presented at the jury trial.

## 2. Utility Box Related Paving

As already noted, the City instructed bidders on the Project, including Underground, to include in their bids a cost per square foot for sidewalk concrete paving. In addition, the bidders were told to set a price per unit for the installation of utility boxes. The price per unit for installing utility boxes that Underground included in its bid did not include any of the cost of sidewalk concrete paving adjacent to the utility boxes (utility box related paving). Rather, Underground understood that utility box related paving would be billed as part of general sidewalk concrete paving, and paid for at the same price per square foot.

During the course of Underground's work on the Project, a dispute arose between Underground and the City as to whether utility box related paving was to be paid on a per square foot basis like other sidewalk concrete paving. The City took the position that it was not required to pay separately for sidewalk concrete paving immediately adjacent to a utility box installed by Underground, because utility box related paving was included in the per unit price for utility box installation. Based on this position, the City declined to pay $33,395.11 of the amount billed by Underground for sidewalk concrete paving.

Underground filed a claim for this amount under the Contract's claim procedures. The City declined to pay this claim, and it was included among those presented at the jury trial.

## 3. Overpaid Inspection Fees

The Contract provided that Underground would pay $95 per hour for inspection fees charged by the City, and estimated that inspection time would amount to about two or three hours per working day. In fact, the City charged Underground for an average of eight hours per day of inspection time, which Underground paid under protest.

Underground sought reimbursement for the overpaid inspection fees through the contractual claims process. The hearing officer found that the City should only have charged Underground as stated in the Contract, and that the overpaid inspection fees

6

should be refunded. The City initially agreed to pay Underground $22,840.33 for the overpaid inspection fees, but later contended that the amount it owed was only $5,710.08, which was more than offset by other claims by the City. The issue of overpaid inspection fees was included in the claims tried to the jury.

### 4. Suspension of Work

Work on the Project began in the fall of 2005. However, on March 23, 2007, the City directed Underground to stop work, and did not permit Underground to resume work until May 29, 2007. Underground protested the suspension, and filed a claim under the Contract's claim procedures for costs resulting from the delay. Part of Underground's claim was for costs in the amount of $15,684.24 incurred in protecting the job site during the suspension of work.[4] The City did not pay Underground for these costs, and the claim was included in the issues tried to the jury.

### 5. Unpaid Retention

As is not uncommon in construction projects, the Contract included a retention clause providing that the City was only obligated to pay 90 percent of the amount billed by Underground during the course of the work. The City retained the remaining 10 percent (the retention). By the end of the work on the Project, the retention amounted to $207,054.65. Under the Contract, Underground was entitled to be paid this amount once the Project was completed to the City's satisfaction.

On July 10, 2007, the City accepted Underground's work as complete and satisfactory. Nonetheless, the City paid Underground only $6,657.14 of the retention, based on the setoff claims discussed in the next section. Underground protested, but the City declined to pay the balance. Underground's claim for the unpaid retention was submitted to the jury.

---

[4] In the contractual claims process, Underground also sought to recover certain office overhead costs it contended should be awarded due to the suspension of work. The trial court granted the City's motion for nonsuit as to those additional costs, however. Underground does not contest that ruling. Underground also asserted two other claims that were rejected by the jury. Underground does not contest those aspects of the verdict.

7

### C. City's Set-off Claims

#### 1. Reduction of Unit Price for Sidewalk Concrete Paving

The Contract set a unit price for sidewalk concrete paving, which was $7.50 per square foot. The City had estimated that the Project would require 40,992 square feet of sidewalk concrete paving, but Underground actually paved 133,485 square feet of sidewalk in the course of the Project. Thus, the actual number of square feet of sidewalk concrete paving that Underground performed was more than 125 percent of the City's original estimate.

The Contract provided that if the number of actual units of a particular type of work was 125 percent or more than the City's estimate, the per unit price for the units in excess of 125 percent could be adjusted under a specified procedure. Based on this provision, the City took the position that the unit price for 82,215 square feet of sidewalk concrete paving should be reduced to $6 per square foot, and withheld $123,322.50 from the retention on that basis. Underground, however, took the position that the City had not followed the procedure for the price adjustment, and was not entitled to impose it unilaterally.

Before the jury trial began, Underground filed a motion in limine to preclude the City from arguing or introducing evidence that the unit price for sidewalk concrete paving should be anything other than the original contract price of $7.50 per square foot. The trial court granted the motion, holding that the City's reduction of the unit price was a breach of contract as a matter of law. The issue whether the City's position was taken in good faith was submitted to the jury, however.[5]

#### 2. Other Amounts Withheld from Retention

The City withheld additional amounts from the retention, as follows: (a) $96,000 for permit fees on the utility boxes that Underground had installed for AT&T; (b) $5,370.40 for damages Underground had allegedly caused to the City's poles and

---

[5] The City prevailed on the good faith issue. Underground does not contest this aspect of the verdict.

signs during the course of construction; and (c) $6,270.95 for the cost of testing for contaminants in the City's soil. Whether Underground was entitled to these amounts, and whether the City withheld them on the basis of a good faith dispute, were issues submitted to the jury.

### D. Trial Court Proceedings and Partial Settlement

Underground sued the Owner Parties for breach of contract on December 28, 2007. The City cross-complained against the Utilities.

On February 4, 2009, the parties participated in a mediation. The mediation resulted in a conditional settlement as between Underground and the Owner Parties (the settlement), the terms of which were memorialized in a brief handwritten agreement (the settlement agreement). The settlement agreement provided that each of the Owner Parties would pay a specified sum "on or before the 10th business day after City Council approval. The City of Oakland expects City Council approval within three months." It also provided: "Should there be no City Council approval of this settlement within three months, this agreement is null and void." The agreement was signed by all parties; the signature on behalf of the City of Oakland was provided by Eric Angstadt, the City's "Deputy Director of CEDA."

By May 2009, three months after the settlement agreement was reached, the Oakland City Council (City Council) had not approved the settlement. Nonetheless, Underground and the Utilities agreed to settle for the amounts the Utilities had agreed to pay under the settlement agreement, provided that the trial court determined the settlements were in good faith. The trial court granted the Utilities' good faith settlement motions, and in June 2009, Underground dismissed its complaint as against the Utilities. The trial court also issued orders dismissing the City's cross-complaint against the Utilities.

Meanwhile, the City declined to proceed with the settlement because the City Council had not approved it. In January 2010, Underground moved to enforce the settlement under Code of Civil Procedure section 664.6. The trial court declined to enter judgment in accordance with the settlement agreement, but ordered the City to present the

9

settlement to the City Council for approval, and continued the trial to give the City time to do so. On March 16, 2010, the City Council voted not to approve the settlement. Underground then renewed its motion under Code of Civil Procedure section 664.6, but the trial court denied it.

The case went to trial in July 2010. It was submitted to the jury on August 5, 2010, and the jury returned its special verdicts on August 10, 2010. On September 2, 2010, the City filed a posttrial motion to reduce the verdict (discussed in more detail *post*). On October 1, 2010, the trial court denied the City's motion to reduce the verdict, and partially granted Underground's motion for prejudgment interest. On October 25, 2010, the trial court entered a judgment awarding Underground $718,911.93, plus prejudgment interest in the amount of $85,022.41. The judgment included a provision awarding Underground its costs, but in the blank provided for the amount of costs, the trial judge wrote "per cost memo."

On November 1 and 2, 2010, respectively, Underground filed a cost bill and a motion for attorney fees under Public Contract Code section 7107. In response, the City filed an opposition to Underground's attorney fee motion; a motion to tax Underground's costs; and its own cost bill. The City's cost bill, filed on November 15, 2010, indicated that attorney fees would be sought by separate motion. In fact, the City never filed such a motion.

On November 18, 2010, Underground filed a motion to strike the City's cost bill. On November 30, 2010, the trial court denied Underground's motion for attorney fees. On December 14, 2010, the court granted Underground's motion to strike the City's cost bill in its entirety, and partially granted the City's motion to tax Underground's costs. On December 21, 2010, the City filed a notice of appeal from the judgment entered on October 25, 2010.[6] The notice of appeal does not indicate that the City was appealing

---

[6] The notice of appeal indicates that the appeal is taken from a judgment entered on October *29*, 2010. This was evidently a typographical error, as no judgment was entered on that date. We therefore construe the notice of appeal as having been taken from the judgment entered on October 25, 2010.

10

from any postjudgment order, and does not mention the trial court's order striking the City's cost bill.

Having resolved the disputes over costs and attorney fees, the trial court entered an amended judgment on January 3, 2011. The amended judgment was substantively identical to the original judgment except that the amount of the cost award to Underground was filled in. The City did not file a notice of appeal from the amended judgment. On January 7, 2011, Underground filed a document constituting both a notice of appeal from the order denying its motion for attorney fees, and a notice of protective cross-appeal from the judgment.

## III. THE CITY'S APPEAL[7]

### A. Consideration of Evidence Regarding Mediation

As already noted, in January 2010, Underground filed the first of two motions to enforce the settlement agreement against the City. In support of the motion, Underground submitted declarations from its counsel setting forth the substance of communications between Underground's counsel, counsel for the City, and City representatives, concerning whether the persons representing the City at the mediation would have authority to agree to a settlement on the City's behalf. These communications (the mediation-related communications) occurred prior to and during the mediation. In addition to the mediation-related communications, Underground also

---

[7] The argument section of the City's opening brief groups the City's arguments by the applicable standard of review (such as substantial evidence) or type of error (such as legal errors in jury instructions), rather than by substantive aspects of Underground's damages claim (such as sidewalk concrete removal). As a result, arguments relevant to the same substantive claim are often found in several different sections of the brief. For the same reason, the City's arguments regarding a particular claimed error by the trial court do not always make clear how the City contends the error ultimately prejudiced its case. This unorthodox approach to appellate briefing has made our task in resolving this appeal considerably more difficult. In this opinion, we have reorganized the issues in an effort to present them in a more coherent manner.

In addition, the City's presentation of the evidence in its opening brief is one-sided and incomplete. This lapse is particularly problematic given the large size of the record in this case. (See *Ajaxo Inc. v. E\*Trade Group Inc.* (2005) 135 Cal.App.4th 21, 50 [appellant has a duty to summarize facts fairly in light of judgment; duty to adhere to appellate procedural rules grows with complexity of record]; *Akins v. State of California* (1998) 61 Cal.App.4th 1, 17, fn. 9; see also *Lewis v. County of Sacramento* (2001) 93 Cal.App.4th 107, 112-114, disapproved on another ground as recognized in *Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26, 41-42.)

On June 11, 2012, Underground filed a motion in this court seeking monetary sanctions against the City for filing a frivolous appeal. On June 28, 2012, that motion was referred for consideration with the merits. Despite the defects in the City's opening brief, and despite our ultimate decision to reject all of the City's arguments on their merits, we are not persuaded that the City's appeal is frivolous under the standards set forth in *In re Marriage of Flaherty* (1982) 31 Cal.3d 637. Accordingly, Underground's motion for sanctions is denied.

12

submitted the settlement agreement itself, as well as correspondence exchanged *after* the mediation concerning the fact that the settlement agreement had not been presented to the City Council for approval.

In its order on Underground's motion, the trial court "accept[ed] [Underground's] position that the City breached the implied covenant of good faith and fair dealing by failing to obtain City Council approval [of the settlement] within three months of February 4, 2009." Later, in its order denying the City's motion for leave to file a cross-complaint, the trial court referred to this finding as one of the reasons why the interests of justice did not require it to grant the motion.

On appeal, the City contends that the trial court erred in considering mediation evidence rendered inadmissible by Evidence Code section 1119 (section 1119), and in relying on it to find that the City acted in bad faith in rejecting the settlement. The City contends that the trial court should not even have entertained Underground's motion to enforce the settlement, because "the proposed settlement was, by its terms, 'null and void.' " This proposition is not supported by any citations to the record or authority. The City further asserts, also without giving details or citing authority, that the trial court's "error" in considering Underground's evidence regarding the mediation "likely led to the adverse rulings that are the subject of this appeal."

Section 1119 precludes the admission into evidence of "anything said or any admission made for the purpose of, in the course of, or pursuant to, a mediation or a mediation consultation," or any "writing . . . that is prepared for the purpose of, in the course of, or pursuant to, a mediation or a mediation consultation . . . ." (§ 1119, subds. (a), (b).)

In its opposition to Underground's January 2010 motion to enforce the settlement, the City objected under section 1119 to the trial court's consideration of the mediation-related communications submitted by Underground in support of the motion. What the City's opening brief fails to acknowledge is that the trial court *sustained* the City's objection to the admission of the mediation-related communications. Thus, the City's argument that the trial court erred by admitting this evidence is belied by the record. The

13

trial court admitted into evidence only the settlement agreement itself, and the post-mediation communications concerning the City's decision not to present the agreement to the City Council for approval.

As for the settlement agreement itself, the rule is that "a settlement agreement reached through mediation and signed by the settling parties is exempt from [the] general rule [of mediation confidentiality], if it satisfies a requirement of [Evidence Code] section 1123. [Citation.] [¶] Section 1123 provides: 'A written settlement agreement prepared in the course of, or pursuant to, a mediation, is not made inadmissible, or protected from disclosure, by provisions of this chapter if the agreement is signed by the settling parties and any of the following conditions are satisfied: [¶] (a) The agreement provides that it is admissible or subject to disclosure, or words to that effect. [¶] (b) The agreement provides that it is enforceable or binding or words to that effect. . . .' " (*Rael v. Davis* (2008) 166 Cal.App.4th 1608, 1619.) In the present case, the settlement agreement *both* was signed by representatives of all parties, *and* expressly provides that "the Parties intend this agreement to be enforceable, binding and admissible pursuant to [Code of Civil Procedure] Section 664.6."

The City nonetheless contends that the settlement agreement was inadmissible under the provision rendering it "null and void" if not approved by the City Council within three months. The City does not cite any authority, however, for the proposition that a settlement agreement otherwise admissible under Evidence Code section 1123 may be rendered inadmissible by the failure of a condition subsequent. The City also does not provide any authority for the proposition that the mediation privilege applies to post-mediation, post-settlement communications between opposing parties' counsel regarding the implementation (or lack of implementation) of a settlement agreement that is itself admissible under Evidence Code section 1123. We therefore decline to consider these arguments. (*People v. Williams* (1997) 16 Cal.4th 153, 206 ["Points 'perfunctorily asserted without argument in support' are not properly raised"].)

In short, the settlement agreement and the post-settlement communications were admissible under Evidence Code section 1123, and City has not persuaded us that the

14

trial court erred in considering them.  Even if this were not the case, however, we are not persuaded that the City was prejudiced in any way by the court's consideration of that evidence.  The trial court ultimately *declined* to enforce the settlement agreement against the City, and we find no support in the record for the City's argument that the trial court became biased against the City as a result of Underground's contention that the City had acted in bad faith in failing to consummate the settlement.

### B.  Amounts Alleged to Be Utilities' Liability

#### 1. Credit for Utilities' Settlement Payments

After the Utilities reached their settlement with Underground, they filed good faith settlement motions under Code of Civil Procedure section 877.6 (section 877.6), seeking a ruling from the trial court that the settlements were arrived at in good faith and that cross-claims against them were therefore barred.  Underground supported the motions, and the City filed no opposition.

The trial court granted the Utilities' good faith settlement motions.  As a consequence of those rulings, the trial court dismissed the City's cross-complaints against the Utilities, and entered a judgment barring the City from seeking indemnity or contribution against the Utilities in connection with any judgment against the City on Underground's claims arising from the Project.  (See § 877.6, subd. (c) ["A determination by the court that the settlement was made in good faith shall bar any other . . . co-obligor from any further claims against the settling . . . co-obligor for equitable comparative contribution, or partial or comparative indemnity, based on comparative negligence or comparative fault"].)

As already noted, after the return of the jury's verdict, and before the entry of judgment, the City filed a posttrial motion to reduce judgment under Code of Civil

Procedure section 877 (section 877[8]). The City argued that it should receive credit against the judgment for the $455,000 that Underground had received from the Utilities under the settlement. Underground opposed the motion to reduce the judgment. The trial court concluded the City was not entitled to any credit against the judgment based on the settlement, and therefore denied the City's motion to reduce the judgment. On appeal, the City contends this was error.

The City contends that it is entitled to a credit based on the language of subdivision (a)(1) of section 877.6, which provides that "Any party to an action in which it is *alleged* that two or more parties are . . . *co-obligors on a contract debt* shall be entitled to a hearing on the issue of the good faith of a settlement entered into by the plaintiff . . . and one or more *alleged . . . co-obligors . . . .*" (Italics added.) The City contends that because the trial court granted the Utilities' motions under this section, the trial court thereby implicitly found true the allegations in the City's cross-complaints that the Utilities were co-obligors with the City on its debt to Underground under the Contract. This implicit finding, the City argues, is inconsistent with the court's subsequent order denying the motion to reduce the judgment, which ruled that under the express terms of the Contract, the City and the Utilities were "severally liable for their own breaches and debts . . . and [were] not . . . co-obligors"—i.e., that the City's contractual liability to Underground was separate from that of the Utilities.

We are not persuaded that the trial court's two rulings are inconsistent. Under the plain language of subdivision (a)(1) of section 877.6, the good faith settlement motion procedure may be invoked by a party *alleged* to be a co-obligor under a contract, whether or not the allegation is factually or legally valid. Thus, the trial court's grant of the good

---

[8] The relevant portion of section 877 provides: "Where a release, dismissal with or without prejudice . . . is given in good faith before verdict or judgment . . . to one or more other co-obligors mutually subject to contribution rights, it shall have the following effect: [¶] (a) It shall not discharge any other such party from liability unless its terms so provide, but it shall reduce the claims against the others in the amount stipulated by the release, the dismissal or the covenant, or in the amount of the consideration paid for it, whichever is the greater."

16

faith settlement motions, and ensuing dismissal of the City's cross-complaints, did not necessarily imply either a factual finding or a legal conclusion that the Utilities and the City *were in fact* joint obligors under the Contract. Rather, it was an adjudication that *if* the Utilities had any liability to the City "for equitable comparative contribution, or partial or comparative indemnity," any and all such liability was extinguished by the settlement under the terms of section 877.6, subdivision (c).[9]

Underground argues that the trial court's good faith settlement rulings were merely advisory, citing *Bailey v. Reliance Ins. Co.* (2000) 79 Cal.App.4th 449 (*Bailey*). In that case, the plaintiff was injured in a car accident while on the job. The plaintiff received workers' compensation benefits from his employer's insurer. The plaintiff and his wife also jointly filed a tort action against the driver of the other car. The workers' compensation insurer intervened in the plaintiff's tort action to enforce its subrogation rights. The plaintiff and his wife settled with the other driver, allocating the entire settlement to the wife's claim for loss of consortium. The workers' compensation insurer then filed a motion, purportedly under section 877.6, seeking a determination that the settlement was *not* in good faith, because its terms were designed to frustrate the workers' compensation insurer's statutory right to a credit against future benefits on account of the settlement. The Court of Appeal held that because the workers' compensation insurer "was not a joint tortfeasor or co-obligor on a contract debt" with the driver of the other car (or with his employer or his employer's liability insurer), the workers' compensation carrier was not a proper party to bring a motion under section 877.6. The court noted that under the statutes governing the subrogation rights of workers' compensation carriers, "[t]he section 877.6 motion, whether granted or denied, had no impact on the liabilities of the parties in the litigation," and went on to say that

---

[9] Consistent with this conclusion, the trial court dismissed the City's cross-complaints against the Utilities. The City not only did not oppose the good faith motions, but also did not object to the entry of, or move to set aside, the judgments dismissing its cross-complaints. The City has therefore waived any argument that the trial court erred in entering those judgments.

17

given those circumstances, "the trial court's determination that the settlement was in bad faith was tantamount to an advisory opinion which should not have been rendered." (*Id.* at p. 458.)

The present case, however, is not on all fours with *Bailey*, *supra*, 79 Cal.App.4th 449. In *Bailey*, the plaintiff did not allege that the workers' compensation carrier was jointly liable with the defendant driver. Here, Underground *did* allege that the City and the Utilities were co-obligors on the Contract, and thus were jointly and severally liable to Underground. We recognize that the City denied this throughout the litigation, and that the trial court ultimately found in favor of the City in this regard, ruling that the City's liability was separate from that of the Utilities. However, at the time the Utilities' good faith settlement motions were made and granted, that issue was not yet resolved. Accordingly, the Utilities were entitled to bring the motions on the basis of their status as *alleged* co-obligors, and the rulings granting the motions were not purely advisory as they were in *Bailey.*

The City also argues that by not granting the City's motion to reduce the judgment, the trial court allowed Underground a double recovery. The trial court itself recognized, however, in its order denying the City's motion to reduce the judgment, that the Contract expressly provided that the Owner Parties would not be liable to Underground for work performed for another Owner Party. Thus, the trial court was fully aware that the City should not be held liable to Underground for amounts owed by the Utilities, and its denial of the City's motion did not rest on a contrary view. Therefore, the City's general argument that the trial court allowed Underground a double recovery by not reducing the judgment is belied by the trial court's own analysis.[10]

Additionally, we are not persuaded by the City's alternative argument that it should be credited for the Utilities' settlement as a matter of equitable indemnity. The City cites *Fassberg Construction Co. v. Housing Authority of City of Los Angeles* (2007)

---

[10] The City also argues that certain specific elements of the damages awarded by the jury were properly recoverable only against one or more of the Utilities. We address these arguments *post* in connection with the specific damages issues involved.

152 Cal.App.4th 720 (*Fassberg*) for the proposition that the trial court should have awarded the City an equitable setoff in the amount paid in settlement by the Utilities. That case arose from a construction dispute involving only two parties: a city housing authority, and its general contractor. After the construction project was completed, the housing authority refused to release any of the amounts it had retained from payments due during the course of construction, and the contractor sued the housing authority. The housing authority cross-complained against the contractor for breach of contract, fraud and misrepresentation, and violations of the California False Claims Act. The housing authority prevailed at trial. On appeal, the court held (among other things) that the contractor was entitled, under general principles of equitable setoff, to reduce the judgment against it by the amount still retained by the housing authority from the payments otherwise due to the contractor. (*Id.* at pp. 762-764.)

This result is unsurprising; it is well established that when two parties mutually owe debts to one another, the two debts may be set off against one another, so that the party owing the greater debt need only pay the net amount. (See *Fassberg*, *supra*, 152 Cal.App.4th at p. 762.) This principle has no bearing, however, on whether the City in the present case is entitled to a setoff against its liability to Underground based on the amounts paid to Underground by the Utilities. The City has not cited any authority for the proposition that a debtor is entitled to an equitable setoff on account of payments made to the creditor *by a third party*. Accordingly, we find no error in the trial court's denial of the City's motion to reduce the judgment.

### 2. Encroachment Permit Fees

The Contract required Underground to obtain and pay for encroachment permits for AT&T utility boxes that were installed as part of the Project, and as to which such permits were "applicable." The Contract provided that Underground would advance the fee for these permits to the City, and then be reimbursed by AT&T.

After the Project was complete, the City withheld $96,000 from the retention owed to Underground on account of encroachment permit fees which the City contended had been incurred but had not been paid to the City by Underground. The jury found that

19

Underground's failure to pay this amount was not a breach of the Contract, and thus denied the City's claim that it was entitled to set off this amount against what it owed Underground.

On appeal, the City contends that the trial court erred in denying its motion in limine number 2 (MIL 2) seeking to exclude evidence of Underground's claim that the $96,000 was improperly withheld.[11] In MIL 2, the City argued that it could not be held liable to reimburse Underground for the encroachment permit fees, because AT&T, not the City, was responsible for reimbursing Underground for those costs. Thus, the City argues that the trial court's denial of the motion in limine was based on an error of law, in that the ruling failed to recognize that the City's liability to Underground was separate rather than joint, and that the fees were the responsibility of AT&T, not the City. The City also contends that the jury's verdict awarding the retained amount to Underground was not supported by substantial evidence.

Underground responds that the trial court's denial of MIL 2 was not premised on the theory that the City was jointly liable with AT&T for this portion of Underground's damages, that is, the damages stemming from the City's retention of the allegedly unpaid permit fees. We agree. In Underground's opposition to MIL 2 in the trial court, it did not argue that the City was jointly liable with AT&T for the "applicable" encroachment permit fees. Rather, Underground argued that no encroachment permits had been required in connection with the AT&T utility boxes. Moreover, as already noted, the record (including the trial court's rulings and jury instructions, as well as the parties' opening statements and closing arguments) makes clear that the trial court understood,

---

[11] The City's opening brief argues that the trial court erred in denying four of the City's motions in limine (MILs). As to two of these MILs—MIL number 1, regarding increased trucking charges due to the delay in starting the Project, and MIL number 3, regarding costs related to soil contamination—Underground states in its respondent's brief that any error in the denial of these MILs was harmless, because the jury found in the City's favor on Underground's claims for delay damages and costs related to soil contamination. The record supports this contention, and the City's reply brief does not dispute it. Accordingly, we deem the City to have abandoned its claims of error regarding the denial of its MIL number 1 and MIL number 3.

and the jury was told, that the City was liable to Underground only for the damages caused by the City's own conduct, and not for damages attributable to the Utilities.

The problem with the City's position on this issue is that the claim which put the $96,000 in encroachment permit fees at issue was not a claim by Underground that it had paid those fees, and that the City breached the Contract by failing to reimburse Underground for them. If Underground had made such a claim, the City would have been correct in maintaining that under the terms of the Contract, Underground should seek recovery against AT&T rather than the City.

Instead, the issue arose due to the *City's* claim that the fees were owed and had *not* been paid, and that the City was therefore entitled to a *setoff* in that amount against the retention otherwise owed to Underground under the contract. A party asserting the affirmative defense of setoff bears the burden of proving its entitlement to the setoff. (See *Construction Protective Services, Inc. v. TIG Specialty Ins. Co.* (2002) 29 Cal.4th 189, 197-198 ["a setoff claim may only be used defensively, being in nature a defensive pleading asserting that the claim constituted prior payment for the amount sought in the plaintiff's complaint"]; *Western Land Office, Inc. v. Cervantes* (1985) 175 Cal.App.3d 724, 731 ["The burden is on the party alleging an affirmative defense to prove it"].) Thus, the City bore the burden of proving that encroachment permit fees were due on the AT&T boxes. Unless and until the City met that burden, the issue whether Underground or AT&T was the party obligated to pay those fees did not arise.

Because the City made a claim against Underground for a setoff in the amount of the encroachment permit fees, Underground was entitled to present evidence, in defense of this claim, that no encroachment permits were "applicable" to the AT&T boxes that Underground installed, and thus that no fees for them were due. Accordingly, the trial court did not err in denying MIL 2.

Moreover, Underground did in fact introduce evidence that the encroachment permits were not actually required. Richard McLaughlin, Underground's project manager, testified that the $96,000 withheld by the City for the encroachment permit fees appeared to have been calculated simply by multiplying the $600 fee by the total number

21

of AT&T boxes installed, yet the City never showed him any documentation establishing that the charge for encroachment permits was "applicable" to each of those boxes. McLaughlin also testified that AT&T told him that the fee should not be paid. Ronald Ward, the City's supervising civil engineer, admitted on cross-examination by Underground's counsel that the City: (1) did not provide Underground with any documentation showing that encroachment permits were required for the AT&T boxes; (2) allowed Underground to proceed with the installation even though the permit fees had not been paid; and (3) did not decide to withhold the $96,000 for the permit fees until after the Project was complete, and the City had consulted with counsel. This evidence is sufficient to support the jury's implied finding that no encroachment permits were required for the AT&T boxes, and therefore that no fees were due for such permits. We therefore find no basis to overturn the jury's verdict precluding the City from recovering on its setoff claim for the encroachment permit fees.

### 3. Overpaid Inspection Fees

In October 2006, in the course of the contractual claims process, the City's hearing officer found that Underground had paid inspection fees in an amount $22,840.33 greater than what Underground was required to pay under the Contract, and was therefore entitled to a refund. The City does not contest the hearing officer's ruling that Underground was entitled to the refund, and it initially agreed to refund the entire amount of the overpaid fees.

However, the City later changed its position, and contended that it was obligated to refund to Underground only $5,710.08 for overpaid inspection fees, which it applied as a credit against the setoffs it asserted against Underground. Prior to trial, in MIL number 4 (MIL 4), the City sought a ruling that it was liable only for $5,710.08 in overpaid inspection fees. As the basis for this claim, the City argued that it was obligated to pay only its proportionate share of the refund, and the remainder was the responsibility of the Utilities. Underground opposed MIL 4, and the trial court denied it. The jury awarded the entire $22,840.33 in overpaid inspection fees to Underground.

22

On appeal, the City argues that the trial court erred in denying MIL 4, and that the jury's verdict awarding Underground $22,840.33 for overpaid inspection fees is not supported by substantial evidence. As in MIL 4, the City's basis for this argument is that its liability for the refund of overpaid inspection fees is limited to its proportionate share of the cost of the Project, as set by the Contract.

The City's argument is premised on a misunderstanding of the nature of Underground's claim on this issue. If Underground were arguing that it had not been paid for some portion of the work on the Project, the City would only be liable for its proportionate share of the additional sum due for that work, and the Utilities would be liable for the remainder. But that is not Underground's position. Rather, in seeking a refund of a portion of the inspection fees that it paid to the City, Underground is contending that the City received an amount of money from Underground to which the City was not entitled. It is undisputed that this money was paid only to the City, and only by Underground; the Utilities were not involved either as payors or as recipients.

In support of its contention that the cost of the refund was to be borne in part by the Utilities, the City relies entirely on a letter from one of its employees, project manager Paul Chan, to another City employee, dated December 1, 2006. Chan's letter stated that "inspection fees . . . are to be equally shared among the trench occupants" (that is, the City and the Utilities); that the City was to bill each party for 25 percent of the inspection fees; and that the cost of refunding the excess inspection fees paid by Underground was also to be "shared equally among the trench occupants." But this letter simply sets forth Chan's self-serving interpretation of the Contract.

There is substantial evidence to support the jury's implied finding that Chan's interpretation was incorrect. The hearing officer's decision stated that any "regular time inspection fee in excess of [$104,500] shall be paid *by the City*." (Italics added.) It was entirely reasonable for the jury to interpret this language to mean that any amounts over $104,500 that Underground had paid for inspection fees were to be refunded *by the City*, which had received the overpayments from Underground in the first place. Indeed, the contrary interpretation now urged by the City is illogical, as it would require the Utilities

23

to bear part of the burden of refunding overcharges, even though the Utilities neither charged nor received any portion of the overpaid amounts. Thus, we find no merit in the City's position that its liability for the refund should have been limited to its proportionate share of the overpaid amount.

### C. Additional Sidewalk Concrete Removal

The City presents several issues on appeal with respect to Underground's claim for the cost of additional sidewalk concrete removal. In order to understand the City's arguments, it is necessary for us to explain Underground's theory of damages on this issue, and how it evolved prior to, and during, the course of the litigation.

During the Project, on May 1, 2006, Underground wrote to the City requesting a change order to cover the additional sidewalk concrete removal that Underground expected to be asked to perform over the course of the Project, based on a projection from its experience up to that point. Underground requested an additional payment of $807,997 for this work. The City rejected the request.

On September 5, 2006, Underground requested a claims resolution hearing, under the terms of the Contract, regarding the additional sidewalk concrete removal. A hearing officer was assigned to review the claim; hearings were held in November 2006; and at the hearing officer's request, Underground supplied additional information on January 11, 2007. On February 8, 2007, the hearing officer issued a decision. The decision acknowledged that Underground had been required to remove more concrete than anticipated by the Contract, and that this was extra work for which Underground should receive payment. It nonetheless recommended that the claim be denied, because Underground had not established the specific amount of extra concrete involved. In August 2007, the City acknowledged that Underground should receive payment for the additional sidewalk concrete removal, but only in the amount of $25,911, based on a cost of $1 per square foot.

In January 2010, the City took McLaughlin's deposition. McLaughlin had calculated that Underground was entitled to $639,668 for the additional sidewalk concrete removal. This figure was based on the assumption that each square foot of the

sidewalk concrete installed in the project corresponded to a square foot of concrete removed, at a cost of $6.92 per square foot.

Just prior to trial, Underground designated George Bradshaw as its expert[12] on the amount of damages Underground should receive for, among other items, the additional sidewalk concrete removal. On June 16, 2010, the City took Bradshaw's deposition. Bradshaw testified that in analyzing the issue of the additional sidewalk concrete removal, he performed a detailed review of documents produced in the course of the litigation in order to determine as accurately as possible the square footage of concrete that Underground had actually removed, and the cost per square foot of that work. Bradshaw explained that the earlier figures given for the amount of the claim had been based on "the best information available at the time," but that he had been "asked to do an independent analysis."

Bradshaw testified, both at his deposition and at trial, that according to his calculations, the City owed Underground $436,810.81 for the additional sidewalk concrete removal. The jury evidently credited Bradshaw's opinion; its special verdict awarded Underground exactly the amount that Bradshaw testified Underground should receive for this claim.

### 1. Motions to Bar Expert Testimony and for Nonsuit on "New" Claim

Prior to trial, the City filed a motion in limine seeking to exclude Bradshaw's expert testimony regarding the additional sidewalk concrete removal on the ground that it amounted to an entirely new claim, as to which Underground had followed neither the contractual claims procedures nor the Government Claims Act (Gov. Code, § 900 et seq.).[13] During trial, the City filed a motion for partial nonsuit on the same grounds. The trial court denied both motions.

---

[12] The City does not dispute Bradshaw's qualifications as an expert.

[13] The City appears to concede that if Underground followed the contractual claims procedure, it was not required to file an additional claim under the Government Claims Act. (See *Arntz Builders v. City of Berkeley* (2008) 166 Cal.App.4th 276, 292 (*Arntz*).)

25

The City now argues that these rulings constituted errors of law. The City's arguments are premised on the contention that the trial court erred in concluding that Bradshaw's analysis was simply a new way of calculating Underground's damages, rather than it being a new claim. On this point, the City has not presented any authority, and we are not persuaded by its arguments. As Underground points out, the essential gravamen of Underground's claim remained the same from beginning to end: in the course of the Project, the City required Underground to remove more sidewalk than contemplated by the Contract, and Underground was entitled to payment for that work. The City does not identify in its briefs on appeal any new facts or witnesses not previously disclosed in discovery that were relied upon in Bradshaw's analysis. Rather, by Bradshaw's own account, he did a more detailed analysis of the information available at the conclusion of the Project in order to calculate more accurately the amount Underground should be paid for the work. Indeed, Bradshaw's figure turned out to be *less* than Underground had projected during the course of the work. The fact that Bradshaw recalculated the cost of the additional sidewalk concrete removal does not mean that Underground was making a new claim.

The City also complains that Bradshaw's analysis was not disclosed until shortly before trial. The City does not contend, however, that Underground failed to comply with the statutes governing expert discovery. Moreover, the City presents no authority for the proposition that it is an error of law (much less an abuse of discretion) to permit a party's expert to give an opinion at trial as to the amount of damages that differs from the amount estimated by the same party in the course of communications prior to or earlier in the litigation. Accordingly, we are not persuaded that the trial court erred in permitting Bradshaw to testify regarding his analysis of the additional sidewalk removal claim, or in denying the City's motion for nonsuit regarding that issue.

### 2. Failure to Instruct Jury on Need to Comply with Claim Requirements

The City's next argument regarding the additional sidewalk concrete removal claim is that the trial court erred in failing to instruct the jury with the City's proposed special instruction number 8, which stated that compliance with the contractual claims

process was an element of Underground's cause of action with regard to these damages. The propriety of jury instructions is a question of law that we review de novo. (*Mize-Kurzman v. Marin Community College Dist.* (2012) 202 Cal.App.4th 832, 845.) However, a judgment in a civil case will not be reversed for instructional error unless it seems probable, based on the record as a whole, that the error prejudicially affected the verdict. (*Id.* at p. 546; accord, *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580.)

In the present case, as requested by both parties, the trial court instructed the jury with California Civil Jury Instruction (CACI) No. 303, which explains that a party seeking to recover damages for breach of contract must prove that it performed or was excused from performing its own obligations under the contract. In addition, the City proposed special instruction number 8, stating that under the terms of the Contract, Underground should be deemed to have waived any claims that were not presented to the City in accordance with the contractual claims procedure. The trial court refused this instruction. The City also requested the trial court to modify CACI No. 303 to state explicitly that compliance with the contractual claims procedure was one of the facts Underground had to prove in order to establish its own performance under the Contract. The trial court declined to make this modification.

As already noted, the record shows that Underground did, in fact, comply with the contractual claims requirement as to the additional sidewalk removal claim. The City's argument to the contrary is premised entirely on its characterization of Bradshaw's damages analysis as constituting a new claim. For the reasons discussed earlier, this premise fails. Accordingly, even if the trial court erred in declining to give a more explicit instruction regarding compliance with the contractual claims procedure (an issue we need not and do not reach), the City is not entitled to any relief on that basis, because the record as a whole makes clear that any such error could not have prejudicially affected the verdict.

### 3. Jury Instruction on City's Response to Requests for Admissions

In January 2010, the City responded to several requests for admissions (RFAs) served on it by Underground. Among these was RFA number 14, which asked the City

27

to admit that it "required Underground . . . to remove and to dispose of concrete sidewalk beyond the score lines of the trench for the Project." (Original capitalization omitted.) The City responded to RFA number 14 by asserting a number of objections; stating that the request was admitted; and adding that "[t]he City required Underground to do so as the result of damage caused by Underground."

During trial, over the City's objections, the trial judge instructed the jury, based on CACI No. 210, that the City admitted it had required Underground to remove and dispose of concrete sidewalk beyond the score lines of the trench. The judge did not mention in the instruction that the City qualified the admission by asserting it had imposed these requirements "as the result of damage caused by Underground." The City argues on appeal that the jury instruction was erroneous due to this omission.

The City's brief cites no authority for the proposition that jury instructions regarding admissions made in discovery responses must include the responding party's explanations or qualifications regarding the scope of the matter admitted. Underground, on the other hand, cites authority that the trial court has discretion to determine the scope and effect of a party's discovery admission, " 'so that it accurately reflects what facts are admitted in the light of other evidence.' [Citation.]" (*Burch v. Gombos* (2000) 82 Cal.App.4th 352, 360.) Accordingly, we apply the abuse of discretion standard of review to the trial judge's decision as to what to include in the jury instruction on this issue.

Here, the trial judge did not preclude the City from introducing evidence supporting its contention that it required the additional sidewalk concrete removal because Underground had damaged areas of sidewalk outside the score lines.[14] On the

---

[14] In connection with the issue of sidewalk concrete removal (as well as sidewalk concrete placement, discussed *post*), the City contends that the trial judge erred in sustaining Underground's objections to portions of the testimony of two witnesses called by the City, Martha (Martie) Locke and David Ross. We are not persuaded that the trial court's rulings were an abuse of discretion, or that the City was prejudiced by them.

28

contrary, the City's witnesses testified that Underground damaged large areas of sidewalk that did not need to be removed for the purposes of the Project. The City also introduced evidence that it documented all additional sidewalk concrete removal that it ordered for its own benefit. Thus, the substance of the City's explanation of the reason for the additional sidewalk concrete removal was included in the evidence considered by the jury.

Moreover, as Underground points out, it would have confused the jury to include the City's explanation in the jury instruction as part of what the City admitted. The City's contention regarding the *reason* for the additional sidewalk concrete removal was not an admission on the City's part, but a disputed fact asserted as part of the City's *defense* to Underground's claim for payment.

The City's discussion of this issue in its opening brief fails to acknowledge the evidence introduced by Underground that controverted the City's explanation. One of Underground's witnesses testified that the sidewalks in the area of the Project were in poor condition when the Project started, and that the City's employees directed

Locke, who worked in job cost accounting for Underground, was not asked about the reasons for Underground's removal of sidewalk concrete, and the City has not cited any evidence in the record that she had any knowledge of that subject. Accordingly, the trial court's rulings on the proper scope of her testimony had nothing to do with the jury instruction regarding the City's response to RFA number 14.

Ross testified at length as the City's expert on various issues, including sidewalk concrete removal (and placement, discussed *post*). The City's opening brief on appeal does not specify what objections to Ross's testimony it contends were improperly sustained, nor does it cite to the relevant portions of the reporter's transcript. To the extent the basis for the City's argument is articulated for the first time in its reply brief, it has been waived. (*People v. Williams*, *supra*, 16 Cal.4th at p. 206; *People v. Baniqued* (2000) 85 Cal.App.4th 13, 29 [point raised for first time in reply brief is deemed waived and will not be considered, unless good reason is shown for failure to present it before].) In any event, the City has not persuaded us that the trial court erred in sustaining Underground's objections to having Ross testify about the reasons for the removal of sidewalk concrete beyond the score lines. As with Locke, the City has not cited any evidence in the record that Ross, who was not present on the job site at the time the concrete was removed, had any knowledge regarding this subject, or any basis to form an expert opinion in that regard.

29

Underground to replace them. One of the City's own witnesses acknowledged that "[f]or the most part," Underground had consulted him before removing any of the concrete. Also, Chan acknowledged that he was unaware of the City's six-foot rule (discussed *ante*) when calculating the amount of sidewalk concrete removal for the purpose of obtaining bids.

Thus, there were factual disputes about the reasons for the additional sidewalk concrete removal, making this a matter for the jury to evaluate.[15] Accordingly, the trial judge did not abuse his discretion in framing the instruction the way he did.

### 4. Jury Instruction Regarding Contractual Duty to Track Extra Work

The City requested that the trial judge give a special instruction (special instruction number 7) stating that the Contract required Underground, "with respect to disputed work . . . to keep records of cost and time incurred with respect to such disputed work," and that if Underground "failed to keep track" as required, it "waived any claims for protested, claimed, or disputed work." The trial judge declined to give the requested instruction. The City argues that this was error.[16]

Once again, the trial court did instruct the jury with CACI No. 303, which explains that a party seeking to recover damages for breach of contract must prove that it performed or was excused from performing its own obligations under the contract. The City's opening brief on appeal cites no authority for the proposition that a defendant is entitled to a supplemental, pinpoint instruction on one particular aspect of the plaintiff's duty to perform, merely because there is evidence that the plaintiff failed to perform in that particular respect.

Underground, on the other hand, cites authority to the effect that duplicative instructions are not required, and that giving repetitious instructions is error when the

---

[15] The City does not argue that the jury's verdict on this issue is not supported by substantial evidence.

[16] The City's opening brief does not identify any issue, other than the additional sidewalk concrete removal, to which this requested instruction would have applied. Accordingly, the City has waived the right to contend that the refusal of this instruction prejudiced it with regard to any other issue.

30

effect is to give undue emphasis to one particular issue. (*City of Los Angeles v. Retlaw Enterprises, Inc.* (1976) 16 Cal.3d 473, 490; *Fibreboard Paper Products Corp. v. East Bay Union of Machinists* (1964) 227 Cal.App.2d 675, 718 ["it is error to give, and proper to refuse, instructions that unduly overemphasize issues, theories or defenses either by repetition or singling them out or making them unduly prominent although the instruction may be a legal proposition"].) We find these cases persuasive, and note that the same principles have been enunciated in more recent authorities as well. (See, e.g., *Major v. Western Home Ins. Co.* (2009) 169 Cal.App.4th 1197, 1217; *Red Mountain, LLC. v. Fallbrook Public Utility Dist.* (2006) 143 Cal.App.4th 333, 359-360.) The City does not discuss or attempt to distinguish any of these opinions in its reply brief. Accordingly, the City has not carried its burden on appeal to convince us that the trial court erred in refusing to give its proposed special instruction number 7.

### D. Sidewalk Concrete Paving

With respect to the placement (as opposed to removal) of sidewalk concrete paving, the City raises two separate sets of issues on appeal. The first concerns the unit price Underground was entitled to charge for each square foot of sidewalk concrete it paved. The second concerns whether Underground was entitled to include in its bills for sidewalk concrete paving the areas of sidewalk that Underground repaved in connection with the installation of utility boxes, or whether that repaving was supposed to be included in the unit price for utility box installation.

### 1. Unit Price for Sidewalk Concrete Paving

*a)*     Contract Interpretation

As already noted, the City withheld the sum of $123,322.50 from the retention otherwise payable to Underground. This amount was based on the difference between the $7.50 per square foot that Underground charged for all of the 133,485 square feet of sidewalk concrete paving that it performed, and the reduced price of $6 per square foot that the City contended was the Contract price for 82,215 square feet of that work.

It is not disputed that the unit price for sidewalk concrete paving specified in the Contract itself was $7.50 per square foot. In fact, the City paid this rate (less the

31

contractually allowed retention, and the amount deducted for utility box related paving, discussed *post*), as billed by Underground, throughout the duration of the Project.

However, when the time came for the City to pay the retention, the City took the position that it was entitled to reduce the unit price to $6 per square foot, retroactively, for the 82,215 square feet by which the amount of paving actually performed exceeded 125 percent of the original estimate of 40,992 square feet. The City based its position on a section of the Green Book, section 3-2.2.1, which provides that "If a change is ordered in an item of work covered by a Contract Unit Price, and such change does not involve a substantial change in character of the work . . ., then an adjustment in payment will be made . . . based upon the increase or decrease in quantity [and] limited to that portion of the change, which . . . is not in excess of 25 percent of the total cost of such item based on the original quantity and Contract Unit Price. Adjustments in excess of 25 percent may be done by extension of Contract Unit Prices as described above, or pursuant to [section] 3-2.2.3."

Section 3-2.2.3, in turn, provides that "Adjustments in payments for changes other than those set forth in [section] 3-2.2.1 . . . will be determined by agreement between Contractor and [the City]. If unable to reach agreement, the [City] may direct the Contractor to proceed on the basis of Extra Work in accordance with [section] 3-3." Section 3-3, in turn, provides that "[w]hen the price for . . . extra work cannot be agreed upon, the [City] will pay for the extra work based on the accumulation of costs as provided herein." The remainder of section 3-3 sets forth a cost-plus-markup formula for extra work paid for under that section. The City arrived at the $6 per square foot unit price based on an application of this cost-plus-markup formula, as applied to its understanding of what Underground was paying its subcontractor for sidewalk concrete paving.

In response to a motion in limine filed by Underground, the trial court determined as a matter of law, based on its interpretation of the Contract, that Underground was entitled to the original Contract price of $7.50 per square foot for all of the sidewalk concrete paving included in the Project. The court therefore precluded the City from

32

introducing evidence to support its contention that the Contract permitted the City to pay the reduced price for a portion of the work.[17]

In its ruling on the motion in limine, the trial court explained that it interpreted the relevant provisions of the Green Book as follows: "Where there is a need to increase the amount of work under the Contract and that increased work is (1) work covered by a Contract Unit Price where there will not be a substantial change in the character of the work, and (2) the amount of work is increased beyond 125% of the contracted amount, the City may (1) extend the work according to [the] Contract Unit Price, (2) [c]ome to an agreement with the Contractor regarding a new price or (3) direct the Contractor to proceed under the 'extra work' provisions under which the City will pay the Contractor a rate based upon the cost of the work plus a reasonable markup.  [¶]  Pursuant to this interpretation and the City's acknowledgement that it continued to pay the Contract Unit Price for concrete restoration [i.e., sidewalk concrete paving] after 125% of the contracted amount of concrete restoration had been completed (and did not come to another agreement or direct [Underground] to proceed under the 'extra work' provisions), the Court concludes that the City breached the contract as a matter of law by later withholding other amounts to retroactively reduce the amount paid from . . . [] the Contract Unit Price[] to $6.00 per square foot."

On appeal, the City contends the trial court's interpretation of the Contract was an error of law.  As the City correctly states, because this issue involves the interpretation of the Contract without regard to any disputed extrinsic evidence, we review the trial court's ruling de novo as an issue of law.  (*Global Packaging, Inc. v. Superior Court* (2011) 196 Cal.App.4th 1623, 1628; *City of El Cajon v. El Cajon Police Officers' Assn.* (1996) 49 Cal.App.4th 64, 70-71; *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865.)

---

[17] During the hearing on this motion in limine, the trial court and the parties referred to the trial court's tentative ruling.  At Underground's request, we have taken judicial notice of the tentative ruling, which we now find to be relevant for the purpose of clarifying the existing record.

The issue boils down to whether the City is correct that the applicable sections of the Green Book permitted the City to reduce the unit price for the additional sidewalk concrete paving to the cost-plus-markup formula, after initially paying Underground based on the original contract unit price, and in the absence of any agreement between the parties that there would be a price adjustment. On de novo review of the applicable language, we agree with the trial court that as a matter of law, the Contract is not susceptible to the interpretation urged by the City.

Section 3-2.2.1 of the Green Book expressly provides that if excess work of the type described in that section is not to be paid for by extension of the unit price, then section 3-2.2.3 applies. That section, by its terms, does not permit the City to use the cost-plus-markup formula unless the City and the contractor are "unable to reach agreement" on a price adjustment, *and* the City "direct[s] the [c]ontractor to proceed on the basis of Extra Work." The reference to "direct[ing] the [c]ontractor to *proceed*" (italics added) clearly implies that payment "on the basis of Extra Work" applies only after the City has given the contractor *advance* notice of its intent to pay for further work on this basis.

The City argues that if the Contract is interpreted to preclude after-the-fact price adjustments for extra work, the City would forfeit the right to adjust the price if it allowed even one unit of such work to proceed without invoking the extra work provisions. We need not address this point, however, because here the City admittedly never "direct[ed] [Underground] to proceed on the basis of Extra Work," and did not seek or impose the price adjustment until after *all* of the extra work was complete. Accordingly, as a matter of law, the City was required to pay the unit price specified in the Contract for all of the additional sidewalk concrete paving.

*b)*     Denial of Discovery

The City's opening brief argues in general terms that the trial court abused its discretion by denying the City adequate discovery regarding Underground's cost information for the Project. The City's brief does not explain, however, how the denial of discovery prejudiced its ability to litigate any specific issue in the case, with the one

34

exception of "self-performed" sidewalk concrete paving.  By failing to articulate in its opening brief on appeal what other prejudice it claims resulted from the denial of discovery, the City has waived the right to contend that the judgment should be reversed based on any other issue affected by the trial court's discovery rulings.  (See *Akins v. State of California*, *supra*, 61 Cal.App.4th at p. 17, fn. 9 [duty to adhere to appellate procedural rules grows with complexity of record].)

With respect to the self-performed sidewalk concrete paving, discovery regarding Underground's costs could have been relevant to this issue if the City were correct that some of Underground's sidewalk concrete paving should have been priced on a cost-plus-markup basis.  However, as discussed *ante*, we have determined (as did the trial court) that the City was required to pay for all sidewalk concrete paving at the contractual unit price.  Accordingly, Underground's costs for self-performed sidewalk concrete paving were not relevant to the amount Underground was entitled to be paid for sidewalk concrete paving, and the City's brief does not explain how those costs were relevant to any other issue litigated at trial.  As a result, the City has not persuaded us that any error in this aspect of the trial court's discovery rulings constitutes grounds for reversing the judgment.  (See *Citizens for Open Government v. City of Lodi* (2012) 205 Cal.App.4th 296, 308 [appellant bears burden to show it is reasonably probable appellant would have received more favorable result at trial had error not occurred]; *County of Nevada v. Kinicki* (1980) 106 Cal.App.3d 357, 363 [discovery order may be reviewed on appeal from final judgment, but judgment will not be reversed unless error is so prejudicial that it constitutes miscarriage of justice].)

*c)*     Exclusion of Evidence

Similarly, the City's opening brief argues in general terms that the trial court erred in excluding evidence, including expert testimony, and cross-examination, regarding various issues.  Most of this argument relates to sidewalk concrete *removal*, which we have discussed *ante*.  To the extent that it relates to evidence regarding Underground's costs for sidewalk concrete *paving*, the City's argument suffers from the same fatal defect as its argument based on the denial of discovery on that subject.  That is, the City's brief

does not demonstrate how it was prejudiced by the exclusion of the evidence to which it refers, given its obligation under the Contract, as a matter of law, to pay the contractually specified unit price of $7.50 per square foot for sidewalk concrete paving.[18]

*d)*     Liability of Utilities

Finally, the City argues in the alternative that even if the original unit price of $7.50 per square foot applied to the additional sidewalk concrete paving, the City was only liable for its share of the resulting liability to Underground. We disagree. As with the encroachment permit issue and the overpaid inspection fees issue, both of which are discussed *ante*, the City's argument is premised on a misunderstanding of the nature of Underground's claim on this issue.

As the work on the Project progressed, the City paid Underground $7.50 per square foot (less a 10 percent retention) for all of the sidewalk concrete paving it billed, including the additional sidewalk concrete payment, except for amounts withheld due to the dispute about utility box related paving (discussed *post*). Thus, the $123,322.50 that the City withheld from the retention, based on its contention that the unit price should have been $6.00 per square foot, was not money that Underground was claiming was owed to it by others for the additional sidewalk concrete paving. Rather, it was an *offset* claimed entirely by the City, which the City had deducted from retention funds that the *City alone* would otherwise have paid to Underground. The Utilities were not liable for

---

[18] In this regard, the City argues that the trial court erred in sustaining Underground's objections during the testimony of witnesses Locke and Ross with respect to sidewalk concrete paving. (The City's arguments regarding these witnesses are also discussed *ante* in connection with the issue of sidewalk concrete removal.) The City has not persuaded us that it was prejudiced by the trial court's ruling sustaining Underground's objections to the City's questioning of Locke and Ross regarding Underground's costs for sidewalk concrete paving, as reflected in Underground's records, and about how much of the paving Underground performed itself rather than having it done by a subcontractor. Given the trial court's ruling that Underground was entitled to be paid the contract price for each square foot of sidewalk concrete paving, and the lack of any dispute about the number of square feet paved, neither Underground's costs for sidewalk concrete paving, nor whether Underground performed the work itself or via a subcontractor, were relevant to the issues submitted to the jury.

any portion of that amount, because it was the City alone which owed those funds to Underground and declined to pay them.

## 2. Utility Box Related Paving

In October 2006, about eight months after work started on the Project, the City began deducting a portion of the progress payments billed by Underground. The basis for the deduction was that some unspecified portion of the sum billed by Underground for sidewalk concrete paving should have been included in the amount charged for placing utility boxes. The City's position was that sidewalk concrete paving done in connection with the placement of utility boxes was supposed to have been included in the unit price for utility box installation.

The jury disagreed with the City's position, and awarded Underground the full amount it claimed on account of the disputed sidewalk concrete paving, which was $33,395.11. On appeal, the City raises several arguments regarding this part of the damages award.

### a) Denial of City's Motion for Nonsuit

First, the City argues that the trial court should have granted its motion for partial nonsuit as to the utility box related paving claim, because the Contract unambiguously required the unit price for installing utility boxes to include restoration of the surrounding sidewalk. The City contends the trial court erred in concluding that the Contract was reasonably susceptible to different interpretations on this point, and that extrinsic evidence was therefore admissible regarding the interpretation of the relevant sections of the Contract.

Underground, on the other hand, argues that there is a latent ambiguity in the Contract, stemming from the interaction among various provisions of the voluminous Contract documents. Special provision number 307-2.4 stated that the unit price for utility boxes was to include "restoring sidewalk . . . damaged during construction." In addition, a note on drawing T-4 in the Contract documents indicated that the contractor was to "include cost of surface restoration work for boxes . . . in the cost of box . . . installation." However, the Contract also included a general provision setting a per

37

square foot price for sidewalk concrete paving. Underground contends that these two provisions of the Contract are arguably inconsistent, because special provision 307-2.4 referred to sidewalk *damaged* during construction of the utility boxes, and drawing T-4 referred to *restoration* work, but the sidewalk paving necessary in connection with the installation of utility boxes was not necessarily attributable to *damage* or *restoration*, as opposed to the *replacement* of sidewalk concrete paving removed in the normal course of construction, which the Contract provided would be paid by the square foot.

The trial court's ruling on the threshold determination of ambiguity (i.e., whether the proffered evidence was relevant to prove a meaning to which the language is reasonably susceptible) is a question of law, not of fact, and is therefore subject to independent review. (*ASP Properties Group, L.P. v. Fard, Inc.* (2005) 133 Cal.App.4th 1257, 1267.) On de novo review, we agree with the trial court's conclusion that the interaction of the Contract provisions summarized above created a latent ambiguity, and that the extrinsic evidence proffered by Underground supported an interpretation to which the Contract language was reasonably susceptible. Accordingly, the trial court did not err in permitting Underground to introduce that evidence.[19]

Underground's extrinsic evidence showed that the Contract not only was susceptible to the interpretation advocated by Underground, but was in fact *given* that interpretation by both parties for a period of time, both during the bidding process and after the work on the Project began. McLaughlin testified that while he was putting together Underground's bid for the Project, he contacted Chan and asked where in the bid to include the cost of sidewalk concrete paving. After McLaughlin consulted with Chan, Underground allocated all the cost for sidewalk concrete paving to the bid price for that

---

[19] The City also argues in passing that it is "entitled to a new trial based on the erroneous admission of prejudicial 'surprise' third party testimony . . . ." This contention is not properly supported by argument, record citations, or citations to authority, and accordingly is waived. (*McComber v. Wells* (1999) 72 Cal.App.4th 512, 522-523 [" '[E]very brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration' "].)

item, and did not include the cost of associated sidewalk concrete paving in the unit prices for utility boxes, or for any other items in the bid.

The representatives of competing bidders mentioned earlier, Boss and Shillinger, also testified that in response to their inquiries, Chan told them all sidewalk concrete paving costs were to be included in the sidewalk concrete paving unit price. Shillinger's inquiry in that regard, and Chan's response, were in writing. Chan wrote to Shillinger that "[t]he bid items for surface repair include all necessary hard surface repair created by . . . excavation for [utility] boxes." Both Boss and Shillinger excluded sidewalk concrete paving from the utility box installation unit prices in their bids.

After Underground's bid was accepted and work on the Project began, Chan expressly told McLaughlin and Underground's project engineer, Richard Doremus, that the City would pay Underground for every square foot of sidewalk that Underground paved. Also, Doremus sent Chan a diagram showing the extent of sidewalk concrete paving that Underground should bill, in order to confirm that the area adjacent to the utility boxes should be included. Given that advice, Underground submitted pay applications that included all sidewalk concrete paving installed during the project, including the paving up to the edge of the utility boxes.

At trial, Chan admitted that he directed Doremus to include sidewalk concrete paving adjacent to the utility boxes in Underground's billing for sidewalk concrete paving, rather than considering it to be included in the unit price for the utility boxes themselves. Chan averred, however, that this was a mistake on his part.

The City's argument that the Contract was unambiguous flies in the face of the testimony of the City's own project manager that he "mistakenly" interpreted it in the manner now advocated by Underground. Given the extrinsic evidence that we have concluded was properly admitted, the trial court did not err in denying the City's motion for nonsuit, and in allowing the jury to resolve the credibility of Chan's testimony that his initial agreement with Underground's interpretation of the Contract was a mistake. (See *City of Hope National Medical Center v. Genentech, Inc.* (2008) 43 Cal.4th 375, 395-396

[when construction of contract turns on credibility of extrinsic evidence, issue of contract interpretation is one for jury].)

*b)*     Jury Instruction on Contract Interpretation

In keeping with its position that the contract language regarding utility box concrete paving was unambiguous, the City requested the trial court to instruct the jury with the City's proposed special instruction number 1, which stated that "Where the language of a contract is clear and not absurd, that language should govern your decisions.  If some of the language is ambiguous, the language that is not ambiguous should be followed."  The trial court refused the instruction.

The City argues on appeal that this was error.  As discussed above, the contractual language regarding utility box concrete paving *was* ambiguous.  Therefore, the City cannot show prejudice from the trial court's refusal of the instruction, because it did not apply to the facts.[20]  (See *G. Voskanian Construction, Inc. v. Alhambra Unified School Dist.* (2012) 204 Cal.App.4th 981, 994 [refusal to give public entity defendant's proposed instruction that public works contracts cannot be orally modified was harmless error, where plaintiff's right to recover did not depend on validity of purported oral modification]; *Soule v. General Motors Corp.*, *supra*, 8 Cal.4th at p. 580 ["Instructional error in a civil case is prejudicial 'where it seems probable' that the error 'prejudicially affected the verdict' "].)  Accordingly, we find no reversible error in the trial court's refusal of the City's proposed special instruction number 1.

*c)*     Substantial Evidence

Finally, the City argues that the jury's verdict in favor of Underground on the utility box concrete claim is not supported by substantial evidence.  As Underground

---

[20]  The City's opening brief does not identify any particular issue, other than the utility box concrete claim, that the requested instruction could have affected. Accordingly, the City has waived the right to argue that the refusal of this instruction prejudiced it in any other respect.  (See *In re Marriage of Falcone & Fyke* (2012) 203 Cal.App.4th 964, 1004 [" 'appellate court can treat as waived or meritless any issue that, although raised in the briefs, is not supported by pertinent or cognizable legal argument or proper citation of authority' " (italics omitted)].)

correctly points out, the City had a duty in its opening brief to summarize the facts fairly, in the light most favorable to the verdict. By failing to do so, the City waived its right to argue that the verdict is not supported by substantial evidence. (*Western Aggregates, Inc. v. County of Yuba* (2002) 101 Cal.App.4th 278, 290.)

Even considering the merits of the City's argument, Underground introduced evidence that City told contractors during the bidding process that utility box related concrete paving would be paid as sidewalk concrete paving, rather than included in the unit price for utility box installation. The City does not dispute that it continued to act in accordance with this position for the first eight months of the project. This evidence alone is sufficient to support the jury's verdict.

Nevertheless, in arguing that the verdict is not supported by substantial evidence, the City relies on contradictions between McLaughlin's deposition and trial testimony, as well as other evidence supporting the City's position. But it is up to the jury to resolve conflicts in the evidence and determine the credibility of the witnesses. The mere existence of contrary evidence in the record is not sufficient to establish on appeal that the verdict was not supported by substantial evidence. (*Whiteley v. Philip Morris Inc.* (2004) 117 Cal.App.4th 635, 678 [" 'when "a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact" ' "]; see also *Shamblin v. Brattain* (1988) 44 Cal.3d 474, 479; *Johnson v. Pratt & Whitney Canada, Inc.* (1994) 28 Cal.App.4th 613, 622-623.)

### 3. Other Sidewalk Concrete Paving Issues

*a)*     Jury Instruction on City's Response to Requests for Admissions

As already noted, the City responded to Underground's RFAs in January 2010. In RFA number 17, Underground asked the City to admit that it "required Underground . . . to pave the concrete sidewalk beyond the score lines of the trench for the Project." (Original capitalization omitted.) As in its response to RFA number 14, discussed earlier in connection with the sidewalk removal claim, the City responded to RFA number 17 by

41

asserting a number of objections; stating that the request was admitted; and adding that "[t]he City required Underground to do so as the result of damage caused by Underground." In RFA number 20, Underground asked the City to admit that it "deducted $123,322.50 for sidewalk concrete paving from Underground['s] . . . retention payment for the Project after Underground . . . paved 133,485 square feet of concrete sidewalk to the City['s] . . . satisfaction." (Original capitalization omitted.) Again, the City responded with an admission accompanied by a number of objections, including "that discovery is continuing; and because discovery is continuing, the City reserves the right, but does not assume the obligation[,] to amend, modify and/or supplement this response."

During trial, over the City's objections, the trial judge instructed the jury, based on CACI No. 210, that the City admitted it "required Underground . . . to pave the concrete sidewalk beyond the score lines of the trench," and that Underground had "paved 133,485 square feet of concrete sidewalk to the City['s] . . . satisfaction." As in his ruling in connection with RFA number 14, once again the trial judge did not mention in the instruction that the City qualified the admission in response to RFA number 17 by asserting it had imposed the requirement for extra paving "as the result of damage caused by Underground." Nor did the trial judge instruct the jury that the admission in response to RFA number 20 regarding the number of square feet of sidewalk Underground satisfactorily paved was made subject to continuing discovery and the City's right to amend.

The City argues on appeal that these jury instruction were erroneous due to these omissions. The City also contends that the error was compounded by the trial judge's remarks to the jury, in ruling on an objection, indicating that the response to RFA number 20, but not the objections, would be read to them as part of the jury instructions.

In fact, as discussed above with regard to the additional sidewalk concrete removal, the jury heard the City's evidence regarding its allegation that Underground was responsible for the cost of the extra paving because Underground damaged the sidewalks. The jury also heard all of the City's response to RFA number 20, including the City's

42

objections, at two different points during the trial. For these reasons, as well as the reasons discussed above with regard to the additional sidewalk concrete removal and RFA number 14, we see no abuse of discretion in the trial judge's decision not to include the City's objections in the scope of the jury instruction regarding the admitted facts.

### *b)* Denial of Leave to Amend Discovery Response

Shortly after the start of trial, the City filed written objections to the introduction into evidence of various discovery responses, including its response to RFA number 20. In the alternative, the City requested leave to amend its response to RFA number 20 so as to deny the requested admission. Underground objected on two grounds: first, the City had not produced evidence supporting its contention that the admitted fact was not actually true, and second, permitting the City to amend its discovery response at that late date would severely prejudice Underground's case. The trial court denied the request to amend.

The City contends on appeal that the trial court erred in not permitting it to amend its response to RFA number 20. However, the City merely alludes to this issue in its opening brief, without any supporting argument or authority. Not until its reply brief does the City explain the basis for this contention. Accordingly, we consider the issue waived.[21] (*People v. Williams*, *supra*, 16 Cal.4th at p. 206; *People v. Baniqued*, *supra*, 85 Cal.App.4th at p. 29; accord, *Rental Housing Owners Assn. of Southern Alameda County, Inc. v. City of Hayward* (2011) 200 Cal.App.4th 81, 94, fn. 12.)

Moreover, counsel for the City admitted at oral argument in this court that the City should have moved to amend its response to RFA number 20 at an earlier stage of the proceedings. Unless and until such a motion was made and granted, the City was bound by its response. (Code Civ. Proc., § 2033.410, subd. (a) ["Any matter admitted in

---

[21] On July 3, 2012, Underground filed a motion in this court seeking to strike the portions of the City's reply brief in which the City made arguments not presented in its opening brief. The City filed a timely opposition. By order filed July 19, 2012, Underground's motion was referred to the panel for consideration with the merits. Because we have disregarded arguments made by the City for the first time in its reply brief, we deny Underground's motion as moot.

response to a request for admission is conclusively established against the party making the admission in the pending action, unless the court has permitted withdrawal or amendment of that admission . . . ."]; *Monroy v. City of Los Angeles* (2008) 164 Cal.App.4th 248, 260 ["[W]hile courts may utilize evidence to elucidate and explain an admission, they cannot use such evidence to contradict the plain meaning of a response to a request for admissions. . . . If a response to a request for admission is unambiguous, and is not subject to different meanings, the matter admitted is conclusively established"].)

### E.  Suspension of Work

As already noted, although work on the Project began in the fall of 2005, it was suspended from March 23, 2007, through May 29, 2007.  By the time of the suspension, Underground's work was almost complete, except for minor "punch list" items and some electrical work to be performed by a subcontractor.  Underground protested the suspension, and filed a claim under the contractual claims procedures for damages it asserted resulted from the delay.  Underground's claimed damages included $113,085.48 for office overhead calculated according to what is termed the "*Eichleay* formula,"[22] and $15,684.24 in direct expenses it incurred to protect the job site, as directed by the City. The direct expenses were for the time Underground's employees spent inspecting the job site, during the suspension period, to ensure that appropriate safety measures remained in place.

The trial judge granted the City's motion for nonsuit with respect to the *Eichleay* formula damages.  Underground does not contest that ruling on appeal.  Underground's claim for direct costs went to the jury, however.  It awarded Underground its full claim of $15,684.24 for direct expenses caused by the suspension.

---

[22] *Eichleay Corp.* (July 29, 1960) ASBCA No. 5183, 60-2 B.C.A. (CCH) ¶ 2688. The formula has been described as the "industry standard for analyzing construction project delay claims." (*Howard Contracting, Inc. v. G.A. MacDonald Construction Co.* (1998) 71 Cal.App.4th 38, 53.)

On appeal, the City contends that the jury's award of damages for the suspension of work is not supported by substantial evidence. The basis for this argument is not entirely clear from the City's opening brief. The City seems to contend that the Contract precluded Underground from "seek[ing] payment for employee time incurred during a work suspension period within the . . . period allowed for Project completion." As record support for this proposition, the City's opening brief cites to the entirety of the voluminous Contract documents, without specifying which portion of the Contract contains the relevant limitation. This record citation does not conform to the requirements of the California Rules of Court, and we accordingly disregard it. (See Cal. Rules of Court, rule 8.204(a)(1)(C) [references to record in appellate briefs must be supported by "citation to the volume *and page number* of the record where the matter appears" (italics added)]; see also *Myers v. Trendwest Resorts, Inc.* (2009) 178 Cal.App.4th 735, 745 [appellate courts cannot be expected to search through voluminous record to discover evidence, when party's brief makes no reference to pages where evidence can be found]; *Akins v. State of California*, *supra*, 61 Cal.App.4th at p. 17, fn. 9 [duty to adhere to appellate procedural rules grows with complexity of record].)

The City also points to a specific provision in the Contract that subjected Underground to "idle time," and required it to stop work when needed to allow the Utilities to complete related work for which those parties were responsible. However, the City's opening brief does not point to anything in the Contract, the record, or California law[23] that precluded Underground from charging the City for the direct cost of personnel time incurred to safeguard the site during such a period of suspended work. Moreover, as Underground's brief points out, one of the City's own witnesses, supervising civil

---

[23] The City does cite to one out-of-state case, *Complete Gen. Constr. v. Dept. of Transp.* (Ohio 2002) 760 N.E.2d 364. That case, however, had to do with the conditions under which a contractor can recover for delay damages in the form of unabsorbed overhead under the *Eichleay* formula. As already noted, the trial court in this case granted the City's motion for nonsuit as to Underground's claim for *Eichleay* damages, and Underground does not contest that ruling on appeal. Accordingly, the cited Ohio Supreme Court decision is not pertinent to the issue presented here.

engineer Ronald Ward, admitted in an internal document that the City is liable to its contractors for losses they incur due to delays attributable to the actions of the City. This testimony is in accord with California law, which precludes a public entity from limiting its liability to its contractors for damages caused by the public entity's own unreasonable delays during a public works project. (Pub. Contract Code, § 7102; see *Howard Contracting, Inc. v. G.A. MacDonald Construction Co.*, *supra*, 71 Cal.App.4th at pp. 49-50.)

The City asserts it is "undisputed" that PG&E, not the City, was responsible for the suspension of work on the Project. There was testimony to that effect, but it was far from uncontroverted. The notice of suspension was issued solely by the City. McLaughlin testified that that the suspension was initiated by the City in the wake of communications between Underground and the City regarding the possibility that the Contract could be modified to eliminate the remaining electrical work. Accordingly, the jury's verdict awarding Underground its direct costs incurred during the suspension is supported by substantial evidence.

## E. Denial of City's Motion to Amend Cross-Complaint

### 1. *Procedural Background*

Based on discovery conducted during the months of December 2009 and January 2010, the City came to believe that Underground's claims for sidewalk concrete removal and utility box concrete constituted false claims under the California False Claims Act (CFCA) (Gov. Code, § 12650 et seq.), and that Underground had breached the Contract by performing defective electrical work which had to be corrected through change orders issued to an electrical contractor. At that time, the case was scheduled to go to trial on February 16, 2010.

On January 19, 2010, the City sought an order shortening time to file an amended answer to Underground's complaint to plead a right to set off the City's damages resulting from Underground's breach of contract and false claims, against any damages awarded to Underground. The trial court denied the request for an order shortening time, on the ground that the trial date was imminent.

46

On January 28, 2010, for unrelated reasons, the February 2010 trial date was vacated. Sometime prior to March 19, 2010, the City set a hearing date of April 26, 2010, for a motion it planned to file seeking leave to file a cross-complaint asserting causes of action under the CFCA and for breach of contract based on Underground's allegedly defective electrical work. The City's motion for leave to file a cross-complaint was ultimately heard on May 11, 2010, and denied on the same day.[24] At the same hearing on May 11, 2010, the court set the case for trial on July 6, 2010.

## 2. *Argument on Appeal*

The City now argues that the trial court abused its discretion in denying what the City's brief refers to as a "motion seeking leave to amend its cross-complaint." This description of the motion mischaracterizes the record. At the time the motion was filed, the City had no cross-complaint pending against Underground. Thus, as the trial court pointed out in its order denying the motion, the City was seeking not to amend a pleading, but rather to file an entirely new one.

The City's brief relies, for its sole legal authority, on the general principle that great liberality should be allowed for *amendments* to pleadings, citing *Board of Trustees v. Superior Court* (2007) 149 Cal.App.4th 1154, 1163. Neither this principle nor the cited authority has any bearing, however, on whether a trial court abuses its discretion in refusing to permit the filing of an entirely new pleading two months before trial in a complex case. On this point, the City cites no authority, and makes no argument.

In any event, we see no abuse of discretion, and no prejudice to the City. As Underground's respondent's brief points out, the City was able to present to the jury, in its defense case, the same evidence and argument that formed the basis for its proposed cross-complaint. The City's contentions regarding Underground's defective electrical work at trial were presented to the jury under the rubric of the affirmative defense of setoff, and the jury rejected the City's position, finding that Underground did not fail to

---

[24] The City subsequently sought a writ of mandate and stay from this court, which were denied on June 30, 2010.

47

complete the required electrical work, and did not fail to obtain necessary permits. The City's evidence and argument as to the lack of merit in Underground's utility box related paving and additional sidewalk removal claims were presented as a defense to the claims in question, and the jury rejected the City's position on those issues as well, finding that Underground was entitled to payment for the additional sidewalk concrete removal and the utility box related paving.

The City has not demonstrated, or even argued, that the jury would have reached a different result on the underlying factual issues if the City had been permitted to frame them in the context of a cross-complaint under the CFCA. Accordingly, the City has failed to sustain its burden on appeal to show that it was prejudiced by the trial court's denial of its motion for leave to file a cross-complaint.

### F. Denial of City's Request for Attorney Fees

In its opening brief, the City argues that the trial court erred in denying what the City refers to as its "motion to recover attorney's fees." We have no jurisdiction to consider this issue, for two reasons. First, the City indicated in its cost bill that it *intended* to file a motion for attorney fees, but never actually filed such a motion. We cannot review the denial of a motion that was never filed.

Perhaps recognizing this, the City implicitly asks that we construe the trial court's order striking the City's cost bill as an order denying the City's (nonexistent) motion for attorney fees. Even if we were to do so, however, we would still lack appellate jurisdiction.

When a party does not file a notice of appeal from an appealable postjudgment order, that party's appeal from the underlying judgment does not entitle the party to seek review of the postjudgment order. (*Norman I. Krug Real Estate Investments, Inc. v. Praszker* (1990) 220 Cal.App.3d 35, 46 (*Krug*).) "A postjudgment order awarding attorney fees is separately appealable. [Citation.]" (*R.P. Richards, Inc. v. Chartered Construction Corp.* (2000) 83 Cal.App.4th 146, 158 (*Richards*).) This is also true of a postjudgment order *denying* attorney fees. (*Krug*, *supra*, 220 Cal.App.3d at p. 46.) Specifically, where, as here, the issue of a party's entitlement to attorney fees is litigated

48

after the entry of judgment, in connection with that party's cost bill, an appeal from the underlying judgment does not give the appellate court jurisdiction to review the order resolving the attorney fee issue. (*Id.* at pp. 45-47.)

Moreover, we cannot construe the City's notice of appeal from the judgment to include an appeal from the postjudgment order striking the City's cost bill (and thus implicitly denying its entitlement to attorney fees). The City's notice of appeal indicates on its face that it was taken only from the judgment, and does not make any reference to any postjudgment order, even though the order striking the City's cost bill had already been entered a week before the notice of appeal was filed. " ' "[W]here several judgments and/or orders occurring close in time are separately appealable (e.g., judgment and order awarding attorney fees), each appealable judgment and order must be expressly specified—in either a single notice of appeal or multiple notices of appeal—in order to be reviewable on appeal." ' [Citation.]" (*Colony Hill v. Ghamaty* (2006) 143 Cal.App.4th 1156, 1171 (*Colony Hill*).) " 'The rule favoring appealability in cases of ambiguity cannot apply where there is a clear intention to appeal from only part of the judgment or one of two separate appealable judgments or orders. [Citation.]' " (*Unilogic, Inc. v. Burroughs Corp.* (1992) 10 Cal.App.4th 612, 625.)

In its reply brief, the City cites *Grant v. List & Lathrop* (1992) 2 Cal.App.4th 993 (*Grant*) for the proposition that an appeal from a judgment awarding costs and attorney fees but containing a blank for the insertion of the exact amounts "subsumes any later order setting the amounts of the award." (*Id.* at p. 998; see *id.* at pp. 996-998.) In *Colony Hill*, *supra*, 143 Cal.App.4th 1156, however, the court held that where the judgment not only leaves open the *amount* of attorney fees, but also the requesting party's *entitlement* to them, the rule enunciated in *Grant* does not apply. In such a case, the notice of appeal must expressly state that it includes the postjudgment order resolving the attorney fee issue. (*Id*. at pp. 1171-1172; accord, *DeZerega v. Meggs* (2000) 83 Cal.App.4th 28, 43-44.)

In any event, here the underlying judgment awarded an as-yet-undetermined amount of costs, but the award was in favor of *Underground*, not the City. Therefore,

49

*Grant*, *supra*, 2 Cal.App.4th 993, is irrelevant. Rather, the applicable authority is *Krug*, *supra*, 220 Cal.App.3d at pages 45-47, which makes clear that due to the City's failure to expressly appeal from the order striking its cost bill, we have no jurisdiction to consider whether the trial court erred in ruling (implicitly) that the City was not entitled to an award of attorney fees.

## IV. UNDERGROUND'S APPEAL

After the trial court entered its initial judgment on October 25, 2010, Underground filed a motion for attorney fees. After briefing and argument, the trial court issued a postjudgment order denying the motion. Underground timely appealed from this order.

Underground based its motion for attorney fees on Public Contract Code section 7107 (section 7107), which governs the payment of retention amounts in public works contracts. Subdivision (c) of section 7107 provides: "Within 60 days after the date of completion of the work of improvement, the retention withheld by the public entity shall be released. In the event of a dispute between the public entity and the original contractor, the public entity may withhold from the final payment an amount not to exceed 150 percent of the disputed amount." Subdivision (f) of section 7107 (section 7107(f)) provides: "In the event that retention payments are not made within the time periods required by this section, the public entity . . . withholding the unpaid amounts shall be subject to a charge of 2 percent per month on the improperly withheld amount, in lieu of any interest otherwise due. Additionally, in any action for the collection of funds wrongfully withheld, the prevailing party shall be entitled to attorney's fees and costs."

Before filing its attorney fee motion, Underground sought a ruling from the trial court that under section 7107(f), it was entitled to the two percent per month penalty (the penalty) with regard to the $5,370.40 that the City retained on account of alleged damage to street signs—the only amount withheld from the retention that the jury found was *not* withheld on the basis of a good faith dispute. The trial court declined to impose the penalty on the ground that the amount withheld for the alleged damage to street signs was so small that the total amount withheld was still less than 150 percent of the amount that

50

the jury found to have been withheld in good faith.[25] On appeal, Underground does not dispute the trial court's ruling that it was not entitled to the penalty.

Underground's appeal from the denial of its motion for attorney fees thus raises the question whether Underground could recover its attorney fees under section 7107(f), even though it was not entitled to the penalty—that is, whether Underground was "the prevailing party" in an "action for the collection of funds wrongfully withheld" within the meaning of section 7107(f). The issue whether the criteria for awarding attorney fees under a particular statute were satisfied, based on the undisputed facts of a given case, is an issue of statutory construction, and thus a question of law. Accordingly, we review the trial court's decision on this question de novo. (*Connerly v. State Personnel Bd.* (2006) 37 Cal.4th 1169, 1175.)

" 'In construing a statute, our task is to determine the Legislature's intent and purpose for the enactment. [Citation.] We look first to the plain meaning of the statutory language, giving the words their usual and ordinary meaning. [Citation.] If there is no ambiguity in the statutory language, its plain meaning controls; we presume the Legislature meant what it said. [Citation.] "However, if the statutory language permits more than one reasonable interpretation, courts may consider various extrinsic aids, including the purpose of the statute, the evils to be remedied, the legislative history, public policy, and the statutory scheme encompassing the statute." [Citations.]' [Citation.]" (*People v. Yartz* (2005) 37 Cal.4th 529, 537-538.)

There do not appear to be any reported cases interpreting the attorney fee provision in section 7107(f). Thus, in concluding that Underground was not entitled to attorney fees under section 7107(f), the trial court relied on a reported case interpreting

---

[25] The trial court did, however, award Underground prejudgment interest on the withheld retention and certain other aspects of Underground's damages. The City does not contest this ruling on appeal.

51

former Civil Code section 3260 (former section 3260[26]).  Like section 7107, former section 3260: (1) sets a time limit within which retention payments must be made by owners to general contractors and by general contractors to subcontractors; (2) permits the owner or general contractor, in the event of a dispute, to withhold up to 150 percent of the disputed amount until the dispute is resolved; (3) assesses a two percent per month penalty on improperly withheld retention payments; and (4) provides for attorney fees.  The attorney fee provision in former section 3260, like that in section 7107, is part of the same single-paragraph subsection as the penalty provision, and reads as follows:  "Additionally, in any action for the collection of funds wrongfully withheld, the prevailing party shall be entitled to his or her attorney's fees and costs."  (Former § 3260, subd. (g).)  This language is identical to the equivalent language in section 7107(f), except for the insertion of the words "his or her."  Thus, as the trial court correctly observed, "[former] [s]ection 3260 mirrors section 7107 except that [section 3260] applies to private construction contracts . . . ."

The case interpreting former section 3260 on which the trial court relied was *Denver D. Darling, Inc. v. Controlled Environments Construction, Inc.* (2001) 89 Cal.App.4th 1221 (*Darling*).  In *Darling*, the court affirmed a trial court order denying attorney fees to a subcontractor under former section 3260.  The trial court found, after a bench trial, that the subcontractor was entitled to the retention that the contractor withheld, but that the contractor had withheld the funds on account of a good faith dispute.  The trial court therefore denied the subcontractor's request for the two percent penalty and attorney fees.  (*Id.* at p. 1229.)  The Court of Appeal agreed that there was a good faith dispute, but held that the amount withheld by the contractor appeared on its face to be potentially excessive, as it was more than 150 percent of the contractor's own contemporaneous estimate of the cost to correct the defect that was the basis for withholding the retention.  (*Id.* at pp. 1241-1242.)  Accordingly, the court remanded,

---

[26]  In 2010, former section 3260 and related statutes were repealed and recodified as Civil Code section 8000 et seq., operative July 1, 2012.  (Stats. 2010, ch. 697, § 16.)  The substance of former section 3260 is now found in Civil Code section 8800.

directing the trial court to determine whether the withheld amount was in fact excessive, "and to reexamine [the subcontractor's] entitlement to attorney fees as the prevailing party." (*Id.* at p. 1242.)

More significantly, for present purposes, the Court of Appeal in *Darling* rejected the subcontractor's argument that it was entitled to attorney fees as the prevailing party, on the basis of its recovery of the retention alone, even if the two percent penalty was held not to apply because the retention was withheld on the basis of a good faith dispute. The *Darling* court reasoned that "the inclusion of the sentence regarding attorney fees in the same paragraph as the sentence imposing a charge of 2 percent per month on improperly withheld amounts, indicates the Legislature's intention that attorney fees are to be awarded only in cases in which the retention payments are not made within the required time periods, i.e., where a bona fide dispute does not exist. The sentence begins with the word 'additionally,' and makes reference to 'funds wrongfully withheld,' indicating that the attorney fees provision directly relates to the preceding provision imposing a 2 percent per month charge on the 'improperly withheld' amount. It would seem that if the Legislature had intended to provide for an award of attorney fees to the prevailing party in every action for collection of retention funds, the provision would have been placed in a separate paragraph." (*Id.* at p. 1241.) After discussing the legislative history of former section 3260, the court added: "The 2 percent penalty and the attorney fees provision are directed at the more egregious situation in which a contractor withholds payment of retention proceeds beyond specified time periods and without cause." (*Ibid.*)

On appeal, Underground does not dispute that the interpretation of former section 3260 in *Darling*, if correct, is appropriately applied to the construction of section 7107. Underground argues at length, however, that *Darling* was wrongly decided.

Section 7107(f) is not a masterpiece of clarity in legislative draftsmanship. As Underground points out, the statute uses two different words to describe the type of withholding of funds that will trigger negative consequences—"improperly" in the

53

penalty provision, and "wrongfully" in the attorney fee provision. It also states that attorney fees shall be awarded in "*any* action for the collection of funds wrongfully withheld," rather than only in actions in which the wrongful withholding meets the criteria for the award of the penalty. Moreover, it authorizes an award of *attorney fees* to the "prevailing party" in such an action, even though the *penalty* may be awarded only against the entity that withheld the retention.[27] Given these linguistic differences between the two provisions, Underground's argument that the Legislature intended the attorney fee provision to apply independently of the penalty provision is not entirely implausible.

Nonetheless, as *Darling* stressed, the attorney fee provision is located in the same subdivision and paragraph of the statute as the penalty provision, and the word "additionally" appears between the two. We agree with *Darling* that this arrangement indicates the legislature intended the attorney fee provision to constitute an "additional" negative consequence, over and above the penalty, for failure to comply with the statute's provisions requiring the prompt payment of retention. (*Darling*, *supra*, 89 Cal.App.4th at p. 1241.)

Moreover, we note that after *Darling* was decided in 2001, the Legislature recodified former section 3260 as Civil Code section 8800, without clarifying the applicability of the attorney fee provision now codified in subdivision (c). The current version of the provision reads as follows: "An owner that violates this section is liable to the direct contractor for a penalty of 2 percent per month on the amount wrongfully withheld, in place of any interest otherwise due. In an action for collection of the amount wrongfully withheld, the prevailing party is entitled to costs and a reasonable attorney's fee."

---

[27] Based on the statute's use of the term "prevailing party," the court in *Taylor v. Van-Catlin Construction* (2005) 130 Cal.App.4th 1061, while not disagreeing with *Darling*, held that the statute authorized an arbitrator's award of attorney fees to a project owner who prevailed against a contractor in the contractor's action for wrongfully withheld retention, and was awarded damages for the contractor's defective work. That holding is, of course, not directly pertinent here.

In the course of the 2010 recodification, the Legislature made two changes in the wording that removed the basis for two of Underground's arguments regarding the language of former section 3260. First, both the penalty provision and the attorney fee provision now refer to "the amount *wrongfully* withheld." (Italics added.) Thus, the former potential inconsistency between "improperly" and "wrongfully" has been eliminated. Second, the Legislature changed former section 3260's reference to "any action for the collection" to "*an* action for the collection" (italics added), thus undercutting Underground's argument that the category of cases in which attorney fees are to be awarded includes *all* actions to collect withheld retention amounts (rather than only those in which the penalty applies).

Even more significantly, when it modified former section 3260 in 2010, the Legislature did *not* make any change in the wording of the statute directed toward overturning the *Darling* court's interpretation of the attorney fee provision. " 'The Legislature, of course, is deemed to be aware of statutes and judicial decisions already in existence, and to have enacted or amended a statute in light thereof. [Citation.]' [Citation.]" (*People v. Yartz*, *supra*, 37 Cal.4th at p. 538, quoting *People v. Harrison* (1989) 48 Cal.3d 321, 329; see also *People v. Overstreet* (1986) 42 Cal.3d 891, 897 [Legislature is deemed to be aware of existing laws and judicial decisions in effect at time legislation is enacted, and to have enacted and amended statutes " ' "in the light of such decisions as have a direct bearing upon them" ' "].) Thus, we may presume that *Darling* correctly interpreted the Legislature's intent, because if it had not done so, the Legislature would have made some change in the statute to make clear that attorney fees are recoverable even when the penalty is not.

For all of these reasons, we are not persuaded by Underground's arguments in support of its construction of section 7101(f). Accordingly, we affirm the trial court's denial of Underground's motion for attorney fees.

## V. DISPOSITION

The judgment from which the City's appeal was taken is AFFIRMED. Accordingly, Underground's protective cross-appeal from that judgment is DISMISSED

as moot.  Insofar as the City's appeal purports to embrace the subsequent order striking the City's cost bill, the appeal is DISMISSED.  The postjudgment order denying Underground's motion for attorney fees is AFFIRMED.  Underground's motions for sanctions against the City for filing a frivolous appeal, and to strike the City's reply brief, are DENIED.  Underground is awarded its costs on appeal.

_____

RUVOLO, P. J.

We concur:

_____

RIVERA, J.

_____

HUMES, J.